REVISED JUNE 15, 2009
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-20254

BRADFORD STONE

Plaintiff-Appellant

v.

UNOCAL TERMINATION ALLOWANCE PLAN;
UNOCAL EMPLOYEE REDEPLOYMENT PLAN;
UNOCAL RETIREMENT PLAN

Defendants-Appellees

Appeal from the United States District Court
For the Southern District of Texas

Before GARWOOD, DENNIS, and PRADO, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant, Bradford Stone (Stone), sued defendants-appellees, UNOCAL Termination Allowance Plan, UNOCAL Employee Redeployment Plan, and UNOCAL Retirement Plan (collectively, defendants), alleging that defendants' actions resulted in his constructive discharge and violated the Employee Retirement Income Security Act (ERISA), specifically 29 U.S.C. § 1132(a)(1)(B), because he was denied unemployment benefits. The district court granted summary judgment for the defendants after determining that the defendants did not abuse their discretion in denying Stone's benefits claim.

Stone v. Unocal Termination Allowance Plan, 542 F. Supp. 2d 605 (S.D. Tex. 2008). Stone now appeals. For the following reasons, we affirm.

FACTS AND PROCEEDINGS BELOW

On August 10, 2005, Chevron Corporation (Chevron) acquired Unocal Corporation (Unocal).[1] Stone was employed by Unocal at the time as a Senior Staff Machinery Engineer. Upon acquiring Unocal, Chevron extended Stone two different job offers—each with identical compensation packages.

Chevron offered Stone a base pay equal to his base pay at Unocal. Additionally, Chevron's Success Sharing program (CSS) replaced the Annual Incentive Program (AIP) in which Stone participated as a Unocal employee. Under CSS, Stone potentially qualified for a target bonus equaling 20% of his base pay, while under the AIP, Stone was only eligible for a target bonus of 17.5% of his base pay. Further, Chevron matched 8% of Stone's 401(k) contributions, compared to Unocal's 6% match. Chevron also recognized Stone's years of service and preserved his Unocal pension benefits. Though Chevron established a plan equivalent to Unocal's Long Term Incentive Plans (LTIP), Stone was not eligible for the plan, and thus lost his Long Term Incentive award (LTI). To offset this reduction, Chevron provided Stone with a continuation bonus equal to 10% of his base pay, so long as he remained employed through March 1, 2006. This bonus exactly matched the discretionary award of restricted stock and stock options Stone would have received under Unocal's LTIP.

Stone accepted a position with Chevron as a Senior Staff Machinery Engineer. He conditioned his acceptance on a review of the offer, which he

[1]Due to the terms of the merger, the Unocal Retirement Plan, a fully-funded defined benefit pension plan, was merged into the Chevron Retirement Plan, also a fully-funded defined benefit plan, and all Unocal Retirement Plan benefits would thereafter be paid from the Chevron Retirement Plan.

2

believed might not provide benefits and compensation equivalent to those he received while employed at Unocal. In October 2005, Stone received a 5% raise in his base pay.

Chevron's acquisition of Unocal constituted a change of control for purposes of any employee arrangement and for all other company benefit plans. Former Unocal employees could qualify for special, enhanced change of control benefits if, within twenty-four months of the acquisition, the employee was either involuntarily terminated or resigned within sixty days after the occurrence of a "constructive discharge" event. The Unocal Retirement Plan, in Article 16(E), defined constructive discharge as follows:

> "[A]n Employee's resignation of employment with a Participating Company, with a Controlling Entity, or with a Successor Entity within 60 days of the occurrence of any of the following events, provided that such event was initiated by a Participating Company, a Controlling Entity, or a Successor Entity:
>
> (1) A reduction in the Employee's base pay.
>
> (2) A reduction in the Employee's annual incentive target award(s) under an applicable annual cash bonus program in which the Employee participates, which is included as Earnings under Section 1.17 [of the Unocal Retirement Plan].
>
> (3) A reduction in the Employee's eligibility for or amount of benefits available to the Employee under this Article 16, or under the Change of Control Event provisions of any other benefit plan of the Company, or the Employee's annual incentive target amount under the Change of Control Event provisions of any stock-based or annual incentive compensation program of the company.
>
> (4) A reduction in the benefits or perquisites available to the Eligible Employee or his dependents as of the day immediately before the Change of Control . . . . Benefits include, without limitation, qualified or nonqualified defined benefit or defined contribution

3

pension benefits; stock-based or annual incentive compensation programs . . . . However, a reduction in benefits or perquisites shall not include a modification of benefits or perquisites which results from a change effected in the ordinary course of business which is applicable to all similarly-situated employees of the Controlling Entity or the Successor Entity and which does not result in a material reduction in the aggregate value of benefits and perquisites available to the Eligible Employee . . . ."

In January 2006, Stone submitted a Constructive Discharge Application to Chevron's Change of Control Administrator (Administrator). He alleged the following constructive discharge events under Article 16.1(E): (1) Chevron's job offer eliminated his LTI award, resulting in a reduction in benefits under Article 16.1(E)(3); (2) the one-time continuation bonus offered by Chevron was insufficient and reduced the benefits previously available to Stone; and (3) Chevron's offer disregarded his annual lump sum increase (LSI) payment, resulting in a reduction in base pay and establishing constructive discharge under Article 16(E)(1) & (2). To satisfy eligibility requirements for change of control benefits, Stone resigned from his position at Chevron on February 28, 2006.[2]

On February 24, 2006, the Administrator denied Stone's claim. The Administrator found that the elimination of the LTI did not reduce Stone's eligibility for benefits under Article 16.1(E)(3), which applied only to change of control benefits. The Administrator explained that under the LTI change of control provisions, upon a change of control event, Stone's LTI awards vested and became immediately exercisable. The Administrator explained that Chevron executed the LTIP change of control provisions; thus, Stone received his

---

[2]The sixty-day period for Stone to claim constructive discharge ended on March 2, 2006. Had Stone remained at Chevron until March 1, 2006, he would have received his continuation bonus.

4

benefits for 2005 and did not qualify for a constructive discharge under Article 16.1(E)(3).

The Administrator also found that the elimination of LTI did not materially reduce Stone's benefits as required by Article 16.1(E)(4). The Administrator explained that, as a prerequisite to eligibility under Article 16.1(E)(4), Stone must have suffered a material reduction in aggregate benefits. The Administrator compared the value of benefits to which Stone was entitled the day preceding the change of control and the aggregate value of benefits to which he was entitled the day after the alleged constructive discharge events and determined that the continuation bonus offset the elimination of Stone's LTI for 2006. Thus, the Administrator concluded, Stone did not experience a material reduction in benefits for 2006. The Administrator declined to speculate about material reductions in future years.

Finally, the Administrator found that Stone's LSI loss did not constitute constructive discharge under Article 16.1(E). The Administrator noted that Stone did not qualify for constructive discharge under Article 16.1(E)(2) because Stone received a higher target bonus under Chevron's cash program. The Administrator also found Article 16.1(E)(1) inapplicable to the elimination of LSI because under Unocal's policies LSI did not constitute base pay. Lastly, the Administrator found Article 16.1(E)(4) inapplicable. The Administrator compared the base pay increase Stone received from Chevron with his LSI loss, and because Stone's salary increases exceeded any LSI reduction, the Administrator held that a material reduction did not occur.

Stone appealed the Administrator's decision to the Change of Control Appeals Committee (Committee), which had exclusive and final discretionary authority to interpret and apply Plan provisions. Stone argued that the Administrator wrongfully denied his claim concerning the loss of LTI and argued

5

that Article 16.1(E)(4) requires the Administrator to account for future losses. The Committee reviewed the eight-page decision provided by the Administrator but did not defer to his determination. The Committee, like the Administrator, interpreted the provision to require consideration of potential benefits available the day before the change of control and the day constructive discharge is claimed; thus, speculative future losses would not be considered when making the comparison. The Committee denied Stone's appeal.

Neither the Administrator nor the Committee inquired into or considered the cost of granting or denying constructive discharge benefits. The Committee's compensation was not affected by the number of appeals granted or denied. It did not report, directly or indirectly, to the Chevron employee with corporate responsibility for constructive discharge claims. All members of the Committee were knowledgeable professionals with experience in human resources and employee benefits, and they had independent counsel to assist them in fulfilling their responsibilities.

Stone filed suit in federal district court seeking to overturn the Committee's determination. Stone alleged that he was unlawfully denied plan benefits in violation of ERISA, specifically 29 U.S.C. § 1132(a)(1)(B). The district court granted summary judgment for the defendants, holding that the Administrator and Committee's interpretation of the Plan was legally correct. The district court also held that the fact that Chevron employed the Administrator and Committee was insufficient evidence to show a conflict of interest, and in any event, no abuse of discretion was made. Stone now appeals.

## DISCUSSION

This court reviews summary judgments in ERISA cases de novo. Crowell v. Shell Oil Co., 541 F.3d 295, 312 (5th Cir. 2008). Because the Plan gives the Committee discretionary authority to construe Plan terms and apply its

6

provisions, its decision is reviewed under an abuse of discretion standard. See White v. St. Luke's Episcopal Health Sys., No. 08-20198, 2009 WL 381131 (5th Cir. Feb. 16, 2009) (unpublished). We apply a two-step process when conducting this abuse of discretion review. Crowell, 541 F.3d at 312. First, we determine whether the Administrator and Committee's determination was legally correct. Id. If so, the inquiry ends and there is no abuse of discretion. Id. Alternatively, if the court finds the administrator's interpretation was legally incorrect, the court must then determine whether the administrator's decision was an abuse of discretion. Id.; Aboul-Fetouh v. Employee Benefits Comm., 245 F.3d 465, 472 (5th Cir. 2001). Only upon reaching this second step must the court weigh as a factor whether the administrator operated under a conflict of interest. See White, slip op. at 1–2; Crowell, 541 F.3d at 312.

Stone finds fault with this two-part analysis. He argues that the Supreme Court's decision in Metropolitan Life Insurance, Co. v. Glenn, 128 S.Ct. 2343 (2008), requires a reviewing court to consider conflicts of interest as a factor in their analysis; thus, he maintains that the Fifth Circuit's two-part analysis, which allows a reviewing court to ignore a conflict of interest in the event of a legally correct interpretation, directly contradicts the Supreme Court's holding. We disagree.

In Metropolitan Life, the Supreme Court was faced with the issue of "whether a plan administrator that both evaluates and pays claims operates under a conflict of interest in making discretionary benefit determinations," and if so, how that conflict should be taken into account on judicial review. 128 S.Ct. at 2347. The Court held that a conflict of interest does exist where "the entity that administers the plan . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." Id. at 2346. The Court

7

further held that "a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits." Id. The significance of the conflict "depend[s] upon the circumstances of the particular case." Id.

Thus, Metropolitan Life announced a new standard for evaluating a conflict of interest; however, that new standard does not affect the first step of this Circuit's analysis and only comes in to play during the second step in considering whether an abuse of discretion has occurred.[3] E.g., White, slip op. at 1–2; Crowell, 541 F.3d at 312. This Circuit does not consider a conflict of interest until the second stage of the analysis because if an administrator's interpretation is legally correct "no abuse of discretion could have occurred." White, slip op. at 1. Therefore, Metropolitan Life has no relevance to the district court's determination that the Administrator and Committee's decision was legally correct. If we agree with that conclusion, we need not consider whether there was a conflict of interest or an abuse of discretion.

A. Legally Correct Interpretation

This court considers three factors when deciding whether an interpretation is legally correct: "(1) whether the administrator has given the plan a uniform

---

[3]Metropolitan Life did, however, alter how this Circuit determines whether a conflict of interest exists. At the time of the lower court's decision, this Circuit's standing rule regarding conflicts was that "[t]he mere fact that benefit claims are decided by a paid human resources administrator who works for the defendant corporation does not, without more, suffice to create an inherent conflict of interest." See MacLachlan v. ExxonMobil Corp., 350 F.3d 472, 479 n. 8 (5th Cir. 2003). The lower court applied this point of law, holding that a conflict of interest did not exist because Stone's only evidence of such a conflict was the fact that the Committee was employed by Chevron. Stone v. Unocal Termination Allowance Plan, 542 F. Supp. 2d 605, 613 (S.D.Tex. 2008). In light of Metropolitan Life, the district court's analysis of whether a conflict of interest existed was incomplete; however, this error by the district court does not here require a remand because the district court also correctly determined that the Administrator's interpretation of the Plan was legally correct, a determination which is not affected by the existence of a conflict of interest.

construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan."[4] Crowell, 541 F.3d at 312. The most important factor in this three-part analysis is whether the administrator's interpretation was consistent with a fair reading of the plan. Id. at 313.

1. Uniform Construction

Stone's first complaint is that the Administrator and Committee did not consistently apply the Plan to similarly situated applicants. Stone alleges that the Administrator and Committee acted inconsistently with regard to two groups of applicants: (1) high-wage earners, like Stone, claiming a constructive discharge due to a loss of LTI benefits and (2) low-wage earners claiming a constructive discharge due to a reduction in base pay for travel time.

As to the first group, Stone argues that the Committee acted inconsistently when it granted the claims of four high-wage applicants alleging a loss of LTI benefits. These four applicants were a part of a group of forty-nine individuals claiming constructive discharge benefits due to lost LTI benefits. Among that group, only four applicants were ultimately successful. Two of those applicants did not receive a continuation bonus (or any other additional benefits) to offset their lost LTI award. The Committee determined that absent this bonus, the applicants suffered a material reduction in aggregate benefits, resulting in a constructive discharge. The other two applicants did receive a $14,000 continuation bonus; however, their LTI benefits had equaled 20% of their base pay, which amounted to more than $30,000 each. Because the $14,000 bonus did not offset lost LTI benefits, the Committee determined that they had suffered a material reduction in aggregate benefits as well.

---

[4]Stone does not argue that there are any unanticipated costs resulting from the differing Plan interpretations; thus, we do not address the third prong.

In contrast, Stone was offered a $14,000 bonus to offset the loss of his LTI benefits—and this bonus exactly matched his LTI benefits which amounted to only 10% of his base pay at Unocal. Thus, Stone was not similarly situated to the four applicants whose constructive discharge claims were granted. And the denial of his claim was consistent with the Administrator and Committee's treatment of the other forty-five applicants whose claims were denied because they received a continuation bonus that adequately offset lost LTI benefits.

As to the second group, Stone alleges that the Administrator granted the claims of thirty-seven low-wage applicants by inconsistently treating their claims as a reduction in base pay under Article 16.1(E)(1) rather than requiring a material aggregate reduction in benefits under Article 16.1(E)(4). These low-wage earners worked at offshore locations. As Unocal employees, they were paid between twenty-five and thirty dollars per hour for travel to and from those locations. After the change of control, Chevron paid these workers only eighteen dollars per "hitch," which was the rough equivalent of paying the workers minimum wage for their travel time. The Administrator interpreted this reduction to fall under Article 16.1(E)(1)—thus, equating it to a reduction in base pay, and he granted all thirty-seven applicants constructive discharge benefits.

Stone argues that the low-wage employees' aggregate loss of income associated with travel should have been treated similarly to losses associated with stock options, restricted stocks, and bonuses. There is nothing in Article 16.1(E)(4) to suggest that payment for "travel time" was considered a benefit under the Plan, and because Unocal employees were paid by the hour, it is reasonable to assume that their base income included payment for travel time to and from work. Unlike these travel time payments, Stone's LTI award was not part of his base pay—instead, it was interpreted as a benefit because it consisted of stock options and restricted stock benefits. Additionally, Stone made no

10

administrative claims concerning a reduction in base pay, and he admitted that his base pay at Chevron was $7,000 higher than it had been at Unocal. Because the LTI award constituted a benefit, it was consistent for the Committee to review its loss under Article 16.1(E)(4). And because the low-wage earners were not similarly situated to Stone, the grant of their constructive discharge claims does not evidence an inconsistent construction of the Plan provisions.

Thus, Stone has failed to point to any similarly situated individuals whose constructive discharge claims were treated differently from his own, and based upon the record, it appears the Administrator and Committee uniformly construed and applied the plan provisions.

2. Fair Reading

Stone also argues that the Administrator and Committee did not give Article 16.1(E) a fair reading. In particular, he argues that the Committee misread Article 16.1(E)(3) to only apply in the event that a change of control provision was triggered, refused to consider future losses under Article 16.1(E)(3) and (4), and misinterpreted the elimination of his LSI under plan provisions.[5]

Again, whether the administrator gave the plan a fair reading is the most important factor. Crowell, 541 F.3d at 313. Under any ERISA plan, the eligibility for benefits "is governed in the first instance by the plain meaning of the plan language." Id. at 314 (quoting Tucker v. Shreveport Transit Mgmt. Inc., 226 F.3d 394, 398 (5th Cir. 2000)). ERISA plans are interpreted in their "ordinary and popular sense as would a person of average intelligence and experience." Id. (same). Thus, plan provisions must be interpreted as they are "likely to be 'understood by the average plan participant, consistent with the

_____

[5]Stone lists these complaints as evidence of an abuse of discretion; however, they relate chiefly to plan interpretation.

11

statutory language.'" Id. (same).

Stone first claims that the elimination of his LTI award constitutes a constructive discharge under the plain meaning of Article 16.1(E)(3), and the Administrator and Committee misinterpreted the meaning of that provision in order to deny his claim. Article 16.1(E)(3) defines a constructive discharge as:

> "A reduction in the Employee's eligibility for or amount of benefits available to the Employee under this Article 16, or under the Change of Control Event provisions of any other benefit plan of the Company, or the Employee's annual incentive target amount under the Change of Control Event provisions of any stock-based or annual incentive compensation program of the Company." (emphasis added)

By these terms, Article 16.1(E)(3) is expressly limited to reductions in the Change of Control benefits provided by Unocal. Specifically, Article 16.1(E)(3) protects only against reductions in (1) benefits available under Article 16, entitled "special Provisions Regarding Change of Control," (2) benefits available under Change of Control Event provisions of other Unocal plans, and (3) incentive target amounts under the Change of Control Event provisions of the stock-based or annual incentive compensation programs like the LTI plan.

Stone's LTI benefits were protected by a change of control provision. After the merger, Chevron complied with these change of control provisions. Because Stone received all the benefits to which he was entitled "under the Change of Control Event provisions" of the LTI Plan, the Committee determined he was not constructively discharged under Article 16.1(E)(3).

Stone argues, however, that Article 16.1(E)(3) provides for the continuation of his LTI award. As discussed above, this reading is inconsistent with a plain reading of the Plan. To agree with Stone's interpretation would require this court to overlook the grammatical structure of Article 16.1(E)(3), which clearly delineates, through the use of commas, that a change of control provision must

12

be affected in order to trigger a constructive discharge under this subsection.

Further, Stone's allegations that Committee members "admitted" to not interpreting Article 16.1(E)(3) according to its plain meaning is simply a mischaracterization of their testimony. Two Committee members testified that Article 16.1(E)(3) dealt with benefits to which employees were eligible following a change of control; thus, the Committee interpreted subsection 3 to apply only when a benefit's change of control provision was triggered. Stone seems to equate this testimony to an admission because it contradicts his own misinterpretation of the Plan. Instead, this explanation is consistent with the Plan's plain meaning because Article 16.1(E)(3) is limited specifically to change of control provisions and provides for constructive discharge when benefits are altered in a manner contrary to those provisions.[6]

Stone also contests the Administrator and Committee's refusal to consider future losses. Specifically, he argues that his continuation bonus was limited to 2006 and, thus, could not offset future losses. These future losses, according to Stone, constitute a material reduction in aggregate benefits under Article 16.1(E)(4). For an applicant to be eligible for benefits, Article 16.1(E) requires that an employee file his application "within 60 days of the occurrence of any of the [specified constructive discharge] events." Additionally, Article 16.1 provided only a twenty-four month protected period after the change of control. Stone estimated his future losses from 2007–2011 because the one-time continuation bonus he received offset his lost LTI benefits only for 2006. The Committee determined that because he had been made whole for 2006, no

---

[6]Stone also argues that the Committee admitted that it did not consider any claims under Article 16.1(E)(3). Again, this is a mischaracterization—the Committee did consider the applicability of the subsection but found it inapplicable because Chevron had adhered to the LTIP's change of control provisions.

constructive discharge event had "occurred." The Administrator and Committee agreed, however, that nothing prevented Stone from filing a constructive discharge application at a later time, should he not receive an offsetting continuation bonus or additional benefits for 2007.

Based upon the Plan's plain language, a constructive discharge event must occur prior to the employee becoming eligible for benefits. Stone applied for constructive discharge on January 1, 2006, but his continuation bonus had made him whole for that year. Still, Stone alleges a constructive discharge event had "occurred" because the reduction in benefits made him subject to future losses. Stone resigned prior to becoming eligible for a 2007 bonus, and he has failed to show he would not have received adequate compensation in 2007 to offset any benefits lost due to the merger event. As to 2008 and beyond, though Chevron inferentially admits it would not have provided Stone with additional compensation to make him whole, the merger agreement imposed no obligation to protect compensation and benefits beyond the twenty-four month protected period. Because Stone's alleged future losses are highly speculative and extend beyond the protected period, it was reasonable and consistent with a plain reading of the provision to disregard those claims.

Finally, Stone argues that the Committee ignored the loss of his LSI and refused to consider it as a reduction in base pay under Article 16.1(E)(1). Unocal's LSI was a discretionary award, made in a single payment, with no resulting incremental increase in the employee's base pay and was not considered "pay" for benefit plans and related purposes. Because the LSI was not a part of base pay, its loss could not constitute a reduction in base pay as required by Article 16.1(E)(1). Thus, the Administrator and Committee properly considered the loss of the LSI award as a "benefit" under Article 16.1(E)(4). The LSI equaled 3.5% of Stone's base pay. In October 2005, Stone received a 5% raise in base pay.

14

This raise resulted in an increase in Stone's base pay, which thereby increased his Savings Plan matching contributions, his Retirement Plan pensionable salary, his cash incentive target bonus, and his continuation bonus. Even without the LSI bonus, Chevron's compensation package was valued at over $7,000 more than what he received from Unocal. Thus, the Administrator and Committee engaged in a fair reading of the plan and properly concluded that Stone had not been constructively discharged as defined by Article 16.1(E). Based upon the above reasoning, the Administrator and Committee's interpretation of the plan was legally correct, and they could not have abused their discretion in denying Stone's benefits claim.[7]

B. Conflict of Interest and Abuse of Discretion

Still, Stone argues that the district court erred when it determined that no conflict of interest existed, and this court should take the existence of that conflict into account when determining whether an abuse of discretion occurred. Although we need not resolve this issue, we note that Metropolitan Life instructs this court that, if an administrator has a conflict of interest, "we weigh the conflict of interest as a 'factor in determining whether there is an abuse of discretion,' . . . meaning we 'take account of several different considerations of which conflict of interest is one.'" Crowell, 541 F.3d at 312 (quoting Metro. Life, 128 S.Ct. at 2350–51). And although a conflict exists where "the entity that administers the plan . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," the Supreme Court further explained that:

"[a] conflict of interest . . . should prove less important (perhaps to

---

[7]See also the somewhat similar case, involving the same plans and many of the same general issues, Robertson et al. v. Chevron Corp. & Unocal Retirement Plan, No. MO-07-CA-42-4, (W.D. Tex. Apr. 3, 2008) (unpublished).

the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."

Metro. Life, 128 S.Ct. at 2346, 2351.  So, even assuming arguendo that a conflict exists, it is attenuated at best.  The plans are both fully funded and independent legal entities, and a decision to pay benefits does not directly affect Chevron because Plan assets are not actually Chevron's assets.  Further, Chevron took multiple steps to avoid a potential conflict: (1) the Administrator and Committee neither investigated nor considered the cost of granting or denying an application for benefits; (2) their compensation was not affected by the number of appeals granted or denied; (3) Committee members did not report to the Chevron employee responsible for constructive discharge claims; (4) they had access to independent counsel to advise them; and (5) Chevron made no attempt to influence the administrative process.

Stone offers no additional evidence of a conflict nor does he provide evidence that the Administrator and Committee acted arbitrarily or capriciously, resulting in an abuse of discretion.  See Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 342 (5th Cir. 2002).   Thus, even if the Administrator and Committee's interpretation had been legally incorrect, no abuse of discretion has been shown.

CONCLUSION

As the Administrator and Committee's interpretation of the Plan was legally correct, no abuse of discretion occurred, and Stone's benefits claim was properly denied.

AFFIRMED

16