**Bruce LEIPZIG, M.D., Plaintiff,**

v.

**PRINCIPAL LIFE INSURANCE COMPANY and Does 1–100, Defendants.**

Civil Action No. 6:09–CV–036–C ECF.

United States District Court, N.D. Texas, San Angelo Division.

March 23, 2010.

Miguel S. Rodriguez, Jennifer Ann Tatum, Karen Crook Burgess, Taylor Dunham & Burgess LLP, Austin, TX, for Plaintiff.

Andrew C. Whitaker, Figari & Davenport, Dallas, TX, for Defendants.

### ORDER

SAM R. CUMMINGS, District Judge.

On this day, the Court considered Plaintiff Bruce Leipzig, M.D.'s (Leipzig) Motion for Summary Judgment filed January 14, 2010, along with Defendant Principal Life Insurance Company's (Principal) Response filed February 3, 2010. The Court also considered Principal's Motion for Summary Judgment filed February 3, 2010, along with Leipzig's Response filed February 24, Principal's Reply filed March 12, and Leipzig's surreply filed March 19. The Court also considered Leipzig's Unopposed Motion to File a Surreply filed March 19, 2010, and GRANTS the same. After considering the relevant arguments and authorities, the Court is of the opinion that Principal's Motion for Summary Judgment should be GRANTED and Leipzig's Motion for Summary Judgment should be DENIED.

### I.

### *BACKGROUND*

In this case, Leipzig seeks to recover disability benefits under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Leipzig is an otolaryngologist practicing in Brownwood, Texas, who claims that an eye disorder[1] that developed in 2005 prevents him from performing surgeries, greatly restricting his practice. Leipzig was a member of a Group Long Term Disability Insurance Plan (the Plan), of which Leipzig's practice, Bruce Leipzig, M.D., was the policy holder. Principal was both the Plan's claims administrator and funder. Principal was obligated to pay Leipzig benefits if it determined that Leipzig was disabled.

Under the Plan, a disability went through two distinct phases. In the first or initial phase, for a Member to receive benefits, the Member had to be disabled for a 3–month period called the Elimination Period. Once the Elimination Period had passed, the Member could begin receiving benefits under the "Own Occupa-

---

1. Leipzig was diagnosed with convergence insufficiency, diplopia, and extropia, which caused Leipzig to have double vision.

tion Period," defined as the first two years in which benefits are payable. At the conclusion of the Elimination and Own Occupation Periods, a Member would continue to receive benefits only if the Member continued to suffer from a disability, as defined under the Plan. Under this second phase, the Plan defined disability as follows:

[a] Member will be considered Disabled if, solely and directly because of sickness, injury, or pregnancy ... [a]fter completing the Elimination Period and the Own Occupation Period, one of the following applies:

(a) The Member cannot perform the majority of the Substantial and Material Duties of any Gainful Occupation for which he or she is or may reasonably become qualified based on education, training, or experience.

(b) The Member is performing the Substantial and Material Duties of his or her Own Occupation or any occupation on a Modified Basis and is unable to earn more than 66 2/3 % of his or her Indexed Predisability Earnings.

(Def.'s App. 43–44.) The Policy defined one's "Own Occupation" as "[t]he occupation the Member is routinely performing for the Participating Unit when his or her Disability begins as performed in the national economy." (*Id.* at 45.)

On April 5, 2006, Principal received Leipzig's claim for disability benefits. After conclusion of the Elimination Period, on June 15, 2006, Principal began paying Leipzig benefits and continued to pay Leipzig benefits throughout the 2–year Own Occupation Period. At the conclusion of the Own Occupation Period, Principal reviewed Leipzig's benefits claim and determined that Leipzig was no longer disabled. In its denial letter, Principal determined that if Dr. Leipzig were to see patients 5 days per week, his income would be at 100% of his pre-Disability earnings. Therefore, [Leipzig] does not meet the definition as Totally Disabled and he is able to perform the majority of the Substantial and Material Duties of any Gainful occupation for which he or she is or may reasonably become qualified based on education, training, or experience.

(*Id.* at 128.)

Leipzig demanded a reconsideration of Principal's benefit determination and argued that he was disabled because he continued to suffer from the eye disorder, which prevented him from performing surgery and greatly restricted his ability to attract and maintain clients in the limited market in Brownwood. After completing a reconsideration review of Leipzig's claim, Principal again determined that Leipzig was no longer disabled. Principal first considered the Policy language, stating that for Leipzig to show a disability, he "must be unable to perform the majority of *any gainful occupation* " or "if [he] is performing the Substantial and Material Duties of his Own Occupation," Leipzig must be "unable to earn more than 66 2/3 [sic] of his Indexed Predisability Earnings." (*Id.* at 545.) Principal then reaffirmed its initial decision, stating:

Dr. Leipzig is not restricted from returning to work but restricted from performing surgery. He is capable of seeing patients on a full time basis with the capacity to earn at least 66 2/3% of his Indexed Predisability Earnings.... The fact that there are not enough patients in his community does not constitute an ongoing disability.

(*Id.*)

On April 2, 2009, Leipzig filed his complaint in this Court against Principal and Bruce Leipzig M.D. Long Term Disability Insurance Plan. In his Original Complaint, Leipzig sought to collect those benefits

that he believed were wrongfully denied. Leipzig also asserted a cause of action for breach of a fiduciary duty against both Defendants. On August 31, 2009, Leipzig amended his complaint, dismissing Bruce Leipzig M.D. Long Term Disability Insurance Plan as a Defendant and adding Does 1 through 100, against whom Leipzig asserted the same causes of action. Principal and Leipzig now move for summary judgment as to the entire Amended Complaint.

## II.

### STANDARD

*Summary Judgment*

"Summary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Condrey v. SunTrust Bank of Ga.,* 429 F.3d 556, 562 (5th Cir. 2005). The movant has the initial burden "to demonstrate that no genuine issue of material fact exist[s]." *Id.* After the movant satisfies that initial burden by establishing the "absence of evidence to support an essential element of the non-movant's case, the burden shifts to the party opponent to establish that there is a genuine issue of material fact." *Id.* "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software, Inc.,* 232 F.3d 473, 477 (5th Cir. 2000). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Id.* At the summary judgment stage, facts are construed in the light most favorable to the non-moving party. *Connors v. Graves,* 538 F.3d 373, 376 (5th Cir.2008).

*Benefit Determinations*

■ Whenever a plan administrator makes a benefit determination, the plan administrator does two things: the plan administrator (1) determines the facts underlying the benefit claim and (2) construes the terms of the plan. *Wade v. Hewlett–Packard Development Co. LP Short Term Disability Plan,* 493 F.3d 533, 537 (5th Cir.2007). The general rule is that factual determinations are reviewed for abuse of discretion and plan interpretations are reviewed *de novo. Id.* at 537–38. However, when the plan gives the plan administrator discretion in interpreting the plan, then the administrator's interpretations are also reviewed for abuse of discretion. *See Schexnayder v. Hartford Life and Acc. Ins. Co.,* 600 F.3d 465, 468–69 (5th Cir.2010); *Wade,* 493 F.3d at 538.

■ When a court reviews a plan administrator's interpretations for abuse of discretion, the court applies a two-step approach. *Stone v. UNOCAL Termination Allowance Plan,* 570 F.3d 252, 257 (5th Cir.2009). First, the court determines if the administrator's determination was legally correct, considering "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations." *Id.* at 258 (quoting *Crowell v. Shell Oil Co.,* 541 F.3d 295, 312 (5th Cir.2008)). "Whether the administrator's interpretation is consistent with a fair reading of the plan is the most important factor to consider in the three-step analysis." *Crowell,* 541 F.3d at 312–13 (internal quotations, citations, and alterations omitted).

If the interpretation is legally correct, the inquiry ends and there is no abuse. *Stone,* 570 F.3d at 257. However, if the court finds that the interpretation was legally incorrect, the court will then determine whether the decision was an abuse of discretion. *Id.* "Only upon reaching this second step must the court weigh as a

factor whether the administrator operated under a conflict of interest." *Id.*

## III.

### *DISCUSSION*

The summary judgment motions in the case require the Court to review Principal's decision to deny Leipzig's claim for long-term disability benefits under the Plan. As a preliminary matter, the Court must determine the appropriate standard of review regarding Principal's decision. Leipzig argues that this dispute involves an issue of Principal's interpretation of the Plan and, in light of Principal's structural conflict of interest, the Court should apply a *de novo* review and give no deference to Principal's benefit determination. Although Principal first argues that the Court is asked to review a factual determination, in the alternative, Principal argues that because the Plan gives Principal discretion in interpreting and applying the Plan's terms, even if the Court determines that the issue involves Principal's interpretation of the Plan, the Court should review such for abuse of discretion. Because the Plan undoubtedly gives Principal discretion in interpreting and applying the Plan's terms (*see* Def.'s App. 30), the Court will review Principal's benefit decision for abuse of discretion. *Wade v. Hewlett-Packard Development Co. LP Short Term Disability Plan*, 493 F.3d 533, 538 (5th Cir.2007).

The Court first notes that there does not appear to be much dispute regarding the underlying facts in this case. Neither party disputes that Leipzig's eye disorder prevents him from performing surgery but does not prevent him from treating patients in his office. Leipzig does not appear to dispute Principal's finding that if Leipzig were to visit clients five days a week, which he is physically capable of doing, he would earn more than 66 2/3 percent of his predisability income. Prin-

cipal does not appear to dispute Leipzig's contention that without the ability to perform surgery as part of his practice, Leipzig is unable to attract sufficient clients to earn more than 66 2/3 percent of his predisability earnings in Brownwood, Texas, where he practices.

Despite the apparent agreement—or, at least, lack of dispute—concerning those underlying facts, the parties reach very different conclusions regarding whether those facts constitute a "Disability" under the Plan. Principal argues that Leipzig is not disabled because his eye condition does not "solely and directly" prevent Leipzig from earning more than two-thirds of his predisability earnings. Leipzig counters that he is disabled because his eye disorder prevents him from performing surgery and without being able to offer surgery as part of his practice, he is no longer able to earn more than two-thirds of his predisability earnings in his practice. Noting the lack of dispute regarding the underlying facts, the Court is of the opinion that the parties' dispute centers on Principal's interpretation of the Plan's terms. In determining whether Principal's interpretation of the Plan was legally correct, the most important factor to consider is whether Principal gave a fair reading to the Plan. *Crowell*, 541 F.3d at 312–13. In considering this factor, the Court must keep in mind that the Plan, as with all ERISA plans, must be interpreted in its "ordinary and popular sense as would a person of average intelligence and experience" so that the Plan is "likely to be understood by the average plan participant, consistent with the statutory language." *Stone*, 570 F.3d at 260 (internal quotations omitted).

As noted above, a member is disabled under the Plan "if, solely and directly because of sickness, injury, or pregnancy . . . [t]he Member is . . . unable to earn more

than 66 2/3% of his or her Indexed Predisability Earnings." A plain reading of the Plan indicates that a member is disabled under this provision only if the member's sickness or injury is the *only* reason why the member is unable to meet the earnings requirement. Here, it is undisputed that Leipzig's eye disorder does not prevent him from entertaining a full-time office-only practice in which he could meet the earning requirement. Instead, as Leipzig fully concedes, it is the Brownwood market that prevents him from maintaining a full-time office-only practice. While it may be true that Leipzig's eye condition was a contributing cause to why he was unable to meet the earnings requirement, under the undisputed facts, the eye condition was certainly not the *only* reason or the *sole* cause. Moreover, to read "solely and directly" as requiring something else, such as only a contributing cause, would not be in keeping with the rules of construction—reading the terms of the plan so that they can be understood by the average participant.

Leipzig argues that Principal's decision was erroneous because Principal denied Leipzig benefits under the wrong provision, denying Leipzig's claim under the "any gainful occupation" language in subsection (a) while ignoring the "Own Occupation" language in subsection (b), under which Leipzig sought benefits. This does not appear to be the case. Without question, Principal was determining whether Leipzig was disabled under the Plan. With both letters of determination, Principal attached the Plan's full definition of the term "disabled," including both subsections, indicating that Principal was considering Leipzig's claim in light of the entire definition

of the word "disable." (*See* Def.'s App. 130, 547.) Moreover, Principal quotes to subsection (b)'s "Own Occupation" language in its letter of reconsideration.[2] That Principal also cited to subsection (a)'s "any gainful occupation language" numerous times in both letters of determination is not error. In fact, for Principal to deny Leipzig benefits, Principal had to determine that Leipzig was not disabled under subsection (a) *and* (b).

Of course, Principal's interpretation of "solely and directly" precludes recovery regardless of whether Leipzig sought benefits under subsection (a) or (b). As Principal noted in its letters of determination, in concluding that Leipzig was not disabled, Principal focused on Leipzig's capabilities as an otolaryngologist. (*See id.* at 128, 545.) Principal found that "Dr. Leipzig is not restricted from returning to work but [is] restricted from performing surgery. He is capable of seeing patients on a full time basis with the capacity to earn at least 66 2/3% of his Indexed Predisability earnings...." (*Id.* at 545.) Principal also noted that "[t]he fact that there are not enough patients in [Leipzig's] community does not constitute an ongoing disability." (*See id.*) Both these passages indicate that Principal was focused on Leipzig's capability as an otolaryngologist notwithstanding the limitations of the particular market in which he practiced or other factors unrelated to his eye disorder. In other words, Principal was determining whether Leipzig's eye condition *by itself* was the reason he was unable to earn more than two-thirds of his predisability earnings. By concluding that this was not the case and citing to language from both subsections (a) and (b), Principal indicated

---

**2.** "The Policy language indicates that a Member must be unable to perform the majority of any gainful occupation for which he or she is or may reasonably become qualified based on education, training, or experience. Or, if the

Member is performing the Substantial and Material Duties of his *Own Occupation* is unable to earn more than 66 2/3 [sic] of his Indexed Predisability Earnings." (*See* Def.'s App. 545) (emphasis added).

that it was interpreting the words "solely and directly" as meaning exactly what they say and finding that they preclude recovery regardless of whether Leipzig sought benefits under subsection (a) or (b). This interpretation does not appear to be erroneous.

■ Next, Leipzig argues that Principal incorrectly interpreted the term "Own Occupation" in the subsection (b) of the Plan's definition of "disabled." While the Court believes that Leipzig was correctly denied benefits under the "solely and directly" language prefacing subsection (b), for the sake of completeness, the Court will consider this argument and reject it. It is true that Leipzig's occupation was undoubtedly built upon a client-base located at or near Brownwood, Texas. Presumably, Leipzig's occupation was not only dependent upon his skills and capabilities as an otolaryngologist but also his client-base in Brownwood, making his occupation not amenable to transfer. While this might give some credence to Leipzig's argument that the term "Own Occupation," at least as applied to Leipzig, should mean his practice in Brownwood specifically, and not his practice as an otolaryngologist generally, the Court's obligation is to determine whether Principal's interpretation constitutes a fair reading to the Plan. In considering whether Principal gave a fair reading, the Court is mindful of how the Plan defines the term. The Plan defines "Own Occupation" as "[t]he occupation the Member is routinely performing ... as performed in the national economy." (Def.'s App. 45.) A fair reading of this term means a member's "Own Occupation" is defined with respect to how that occupa-

tion is performed generally—in the national economy—and not in a specific location. Thus, despite the realities of Leipzig's practice, Principal's obligation was to determine Leipzig's capabilities as an otolaryngologist generally, and not as an otolaryngologist in Brownwood, Texas.

While Leipzig contends that it is not apparent from the letters of determination that Principal relied upon the Plan's definition of "Own Occupation" in making its determination, the Court disagrees, for many of the reasons previously mentioned. Principal attached the definition of the term "Own Occupation" to its letters of determination, and in citing to the "Own Occupation" language from subsection (b), it is apparent that Principal considered that definition in making its determination. Moreover, Principal's focus on Leipzig's capabilities as an otolaryngologist generally indicates that Principal not only considered Leipzig's claim as precluded under the "solely and directly" language prefacing subsection (b), but that Principal also considered Leipzig's claim as precluded under subsection (b)'s "Own Occupation" language. While Leipzig contends that this interpretation has the effect of adding a "forced relocation" provision in the Plan, requiring Leipzig to move an unspecified larger market to have an office-only practice, this is not the case. Principal simply interpreted the terms in the Plan, and those terms required Principal to focus on Leipzig's capability as an otolaryngologist and not on the capacity of the Brownwood market to support an otolaryngologist with an office-only practice. The Court finds no error in Principal's interpretation.[3]

---

**3.** It is uncontested that there are no comparable claims to consider in this case. (*Compare* Pl.'s Resp. 15 & n. 15 *with* Def.'s Reply 4.) In short, there is no evidence indicating an inconsistency in Principal's interpretation of the Plan. *See Gooden v. Provident Life & Acc. Ins. Co.*, 250 F.3d 329, 333 (5th Cir.2001) (noting

a court may consider "evidence that 'relates to how an administrator has interpreted terms of the plan in other instances.'") (quoting *Estate of Bratton v. Nat'l Union Fire Ins. Co.*, 215 F.3d 516, 521 (5th Cir.2000) (alteration omitted)).

Finally Leipzig argues that summary judgment should be granted in his favor because Principal's decision was tainted by a structural conflict of interest. *Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 248 (5th Cir. 2009) ("Where, as here, the employer who funds the plan also determines eligibility for benefits, a structural conflict of interest exists."). While this argument is foreclosed by the Court's finding that Principal's interpretation was legally correct, even if the Court had found otherwise, the Court would still uphold Principal's decision.

A structural conflict of interest can be created by "the plan administrator's dual role in making benefits determinations and funding the benefit plan." *Schexnayder v. Hartford Life and Acc. Ins. Co.*, 600 F.3d 465, 469–70 (5th Cir. 2010). Structural conflicts " 'should be taken into account on judicial review of a discretionary benefit determination.' " *Id.* (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2350, 171 L.Ed.2d 299 (2008)). Courts should weigh such conflicts as a factor to consider when determining whether there is an abuse of discretion, with the weight afforded to that conflict dependent upon the circumstances of a particular case. *Id.* For example, a conflict might be deemed more important where an administrator has a history of biased claims administration, suggesting a higher likelihood that the conflict influenced the benefits decision. *Id.* The conflict might be deemed less important where an administrator has taken active steps to reduce potential bias, such as where the administrator pays the benefits into an irrevocable trust so the benefits determination does not affect the administrator's bottom line. *See Holland v. International Paper Co. Retirement Plan*, 576 F.3d 240, 249 (5th Cir.2009)

In this case, Principal had a structural conflict of interest because Principal both funded the plan and made the benefits determination. *See Glenn*, 128 S.Ct. at 2350. The importance of this conflict depends upon the particular circumstances of this case. The Fifth Circuit recently addressed how courts ought to weigh such a structural conflict of interest. In *Schexnayder v. Hartford Life and Accident Insurance Co.*, the plaintiff belonged to a long-term disability insurance plan and began receiving benefits under that plan when severe back and leg pain forced him to cease working. 600 F.3d at 467–68. In the interim, the Social Security Administration (SSA) determined that the plaintiff was totally disabled—meaning he could not perform any work—and authorized him to receive disability benefits, for which the plaintiff reimbursed the plan administrator. *Id.* At the conclusion of the initial period, the plan administrator had to determine whether the plaintiff's disability prevented him from working not only in his regular occupation but in any occupation. The evidence before the administrator was conflicting, with the plaintiff's treating physicians stating that he was incapable of doing any work and the reviewing physician determining that his disability did not prevent him from performing light and sedentary work on a full-time basis. *Id.* at 469–70. After determining that the plaintiff could perform light and sedentary work, the plan administrator denied the plaintiff benefits.

In reviewing the decision, the Fifth Circuit held that although the plan administrator's factual determination was supported by substantial evidence, the decision constituted an abuse of discretion. *Id.* at 468–69, 471–72 (noting that typically a plan administrator's factual determination need only be supported by substantial evidence). In finding abuse, the Fifth Circuit cited to the presence of "procedural unreasonableness" in weighing the structural conflict of interest

heavily. The Fifth Circuit found that the plan administrator's failure to address the SSA's award determining the plaintiff to be totally disabled, especially after the plan administrator had financially benefitted by the SSA's determination, "suggest[ed] procedural unreasonableness in [the] plan administrator's decision." *Id.* at 470–71 (quotations omitted). As the court concluded,

> This procedural unreasonableness justifies the court in giving more weight to [the plan administrator's] conflict because it suggests financial bias may have affected [the plan administrator's] decision. We also consider the failure to address the SSA's decision as a factor in its own right. Although substantial evidence supported [the plan administrator's] decision, the method by which it made the decision was unreasonable, and the conflict, because it is more important under the circumstances, acts as a tiebreaker for us to conclude that [the plan administrator] abused its discretion.

*Id.* at 471 (internal quotations, citations, and alterations omitted).

Although *Schexnayder* addressed a plan administrator's abuse regarding a factual determination, the Court finds the *Schexnayder* reasoning instructive here. The mere fact that a plan administrator is both the claims administrator and the plan funder does not necessarily tip a close case in a plan member's favor. Instead, the Court should look to other factors suggesting a "procedural unreasonableness" that will act as a sort of "tiebreaker," justifying the Court in giving greater weight to the structural conflict than it might otherwise. *See Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 2351, 171 L.Ed.2d 299 (2008). While Leipzig argues that Principal's structural conflict should be weighed heavily, Leipzig does not go beyond this. Nothing presented by either party suggests that Principal had a history of biased claims decisions or was somehow procedurally unreasonable in interpreting the provisions of the Plan. In short, nothing justifies weighing this conflict any differently than it might in another case where a structural conflict exists. *See Glenn,* 128 S.Ct. at 2352–53 (Roberts, C.J. concurrence) (noting that "many if not most ERISA cases" will involve a third-party insurer playing the dual role as claims administrator and plan funder). Therefore, the Court is of the opinion that Principal did not abuse its discretion in denying Leipzig benefits.[4] Accordingly, Leipzig's motion for summary judgment will be denied as to his claim for an award of benefits under the Plan.

Next, the parties move for summary judgment on Leipzig's claim for breach of fiduciary duty. Leipzig's theory is that Principal, by wrongfully denying Leipzig's claim for benefits, also breached its fiduciary duty owed to Leipzig. Because the Court has found that Principal did not wrongfully deny Leipzig benefits under the Plan, Leipzig's claim for breach of fiduciary duty has been foreclosed and must be dismissed.[5]

---

4. Leipzig argues that Principal's failure to seek the assistance of an independent doctor or vocational expert to opine on the effect of Dr. Leipzig's condition constituted an abuse of discretion. However, as Leipzig openly admits, it is Principal's interpretations of the plan that are being challenged, not Principal's factual determinations regarding Leipzig's capabilities, which are not in dispute. (*See* Pl.'s Mot. 5.) This argument is not persuasive.

5. Principal raises several objections to evidence Leipzig attached to his Motion for Summary Judgment and Response. Principal objects to Leipzig's Declaration and his Amended Complaint, both of which are attached to Leipzig's Motion for Summary Judgment. Principal also objects to the complete transcript from the deposition of Principal's corporate representative, an alleged "incomplete" version of Principal's determination letters, an expert report from one of

The Court is also of the opinion that all claims asserted against Does 1 through 100 should be dismissed as well. Leipzig's claims against the Does are identical to the claims he asserts against Principal. Thus, for the same reasons the Court will dismiss all claims against Principal, the Court will also dismiss all claims against Does 1 through 100.

## IV.

### *CONCLUSION*

For the reasons stated herein, the Court DENIES Leipzig's Motion for Summary Judgment and GRANTS Principal's Motion for Summary judgment and Orders that Leipzig's Amended Complaint against Principal be DISMISSED.

For the same reasons Leipzig's claims against Principal are dismissed, the Court ORDERS that Leipzig's claims asserted against Does 1 through 100 be DISMISSED.

Principal's request for attorney's fees is DENIED.

Leipzig's experts, and a letter from another of Leipzig's experts, each of which was attached to Leipzig's Response. In considering the parties' respective summary judgment motions, the Court only considered matters in the administrative record. To the extent the Court could have considered extrinsic evidence, the Court notes that neither party presented evidence of Principal's interpretation of the plan in prior instances. Accordingly, the items to which Principal objected were not considered and, to the extent they were considered, were not considered as summary judgment evidence. Therefore, Defendant's objections are overruled as moot.