# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
May 13, 2011

Lyle W. Cayce
Clerk

No. 10-30720

DONNA HARGRAVE,

Plaintiff-Appellee,

versus

COMMONWEALTH GENERAL CORPORATION'S
LONG TERM DISABILITY PLAN,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana
No. 6:09-CV-788

Before SMITH, DeMOSS, and OWEN, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-30720

Commonwealth General Corporation's Long-Term Disability Plan[1] appeals a summary judgment in favor of Donna Hargrave granting disability benefits pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The main issue is which of two versions of the Plan applies. Commonwealth argues that, under a 1998 version of the Plan, it may offset a tort settlement Hargrave received in 1994 against her 2006-2011 benefits, and Hargrave contends that it may not do so under a 1991 version of the Plan. Because Commonwealth's determination that it may offset pre-1998 tort settlements against the payment of post-1998 disability benefits under the 1998 version of the Plan is legally correct, we vacate and remand.

I.

Hargrave was employed by Commonwealth Insurance Company, where she was covered for disabilities under the Plan, which she paid for through payroll deductions. In June 1991, she was seriously injured in a car accident. In March 1992, after a determination that she was totally disabled, Commonwealth granted her monthly disability benefits.

In 1994, Hargrave settled her tort claims against the person allegedly responsible for the accident. Under the terms of that settlement, she received a lump sum of $445,000 and $1,939.96 per month for 240 months from the tortfeasor's insurer.[2] The Plan in effect in 1991 through 1997 ("the 1991 Plan") did not allow Commonwealth to offset tort settlement proceeds against Hargrave's monthly disability benefits. The 1991 Plan did state, however, that the "com-

---

[1] Because Commonwealth General Corporation's Long-Term Disability Plan refers to both an insurance agreement and a legal person, we use "the Plan" when referring to the agreement and "Commonwealth" when referring to the legal person.

[2] In addition, Hargrave's husband and four children received lump sums of $25,000 and $7,500 each, respectively.

No. 10-30720

pany reserves the right to change or discontinue this Plan."

The 1991 Plan was amended in 1998 ("the 1998 Plan") to provide, in a section titled "Effect of Other Income on Benefits," that disability benefits "will be reduced to the extent that you qualify for benefits payments from . . . disability payments which result from the act or omission of any person whose action caused your disability. These payments may be from insurance or other sources." The 1998 Plan further states that "[a]ny of these 'Other Income Benefits' that date back to a prior date during a certified period of disability may be allocated on a retroactive basis." It then explains that, if the claims administrator determines there has been an overpayment of benefits, it may "reduce, by the amount of overpayment, any future benefit payment made to or on behalf of you or your dependent(s)." Failure to reimburse an overpayment "will result in suspension of benefits until reimbursement has occurred." In addition, the 1998 Plan includes an amendment limiting the timing of any legal action against Commonwealth to three years from the initial denial of a claim.

In September 2005, Sally Kalnas, claims manager for Commonwealth, wrote Hargrave advising her that Commonwealth was "unable to issue your benefits check" because Hargrave was receiving workers' compensation payments that should have been offset.[3] Kalnas requested information about those benefits "to avoid any further overpayment situation." Despite the language in Kalnas's letter, Commonwealth continued to pay Hargrave monthly benefits.

Hargrave submitted information to Commonwealth showing that the payments she was receiving were tort settlement payments. Kalnas responded in June 2006 that, because of the settlement income Hargrave was receiving, there

---

[3] Hargrave was not receiving workers' compensation payments, but contemporaneous emails in the administrative record show that Kalnas mistakenly believed at the time that the $1,940/month in settlement payments that Hargrave was receiving were workers' compensation settlement payments rather than tort settlement payments.

was an overpayment in her disability benefits. Kalnas's letter, citing the 1998 Plan, stated that the disability benefits should have been offset since 1994 by the lump sum settlement proceeds Hargrave had received. The letter explained that, as a result of the failure to offset the settlement proceeds from 1994 on-ward, Hargrave had been overpaid $82,185, and her future monthly benefits would be withheld for five years to recoup that overpayment.[4]

Hargrave responded in May 2007 that none of the 1991 Plan's terms required the offsetting of tort settlement proceeds; she attached a page of the 1991 Plan to her letter. Kalnas replied in June and explained that, under the 1998 Plan, benefits would be reduced to the extent Hargrave qualified for "benefit payments from . . . disability payments which result from the act or omission of any person whose action caused your disability." Kalnas acknowledged that the 1998 Plan does not "specifically list 'settlement of a tort claim,'" but she never-theless concluded that the provision Hargrave cited covered tort settlements.

Hargrave sent another letter to Kalnas in December 2007 arguing that Kalnas's "reliance on the 1998 Plan is incorrect," because it went into effect "long after [Hargrave]'s accident, disability, and tort settlement." Hargrave requested "further explanation" of the decision to deny Hargrave's benefits pursuant to the 1998 Plan rather than the 1991 Plan. Kalnas responded in January 2008, stat-ing only that she was enclosing a copy of the 1998 Plan and telling Hargrave that she was waiting for an answer from AEGON "in regards to any amend-

---

[4] The $82,185 overpayment was calculated as follows: Hargrave received $1,369.75 per month in disability benefits from Commonwealth in the five years from December 1, 1994, to November 30, 1999. Under the 1998 Plan, an offset of a lump sum payment or a periodic pay-ment "that could have been chosen in a lump sum" may last no longer than five years. Be-cause Hargrave had obtained five years' worth of disability benefits that should have been completely offset, Kalnas calculated the offset to equal those five years' worth of disability ben-efits, for a total of $82,185.

No. 10-30720

ments during the time frame in question" that would affect her determination.[5]

In June 2008, Hargrave wrote to Kalnas stating that she was still waiting for a response and restating her argument that the 1991 Plan should apply. Kalnas responded that same month stating that she would "have to direct" Hargrave to AEGON, which was now in possession of Hargrave's file and policy; Kalnas provided a contact person, Tina Ohl.[6] Hargrave sent Ohl a letter repeating her arguments that the 1991 Plan should apply, but Ohl never responded.

Hargrave sued AEGON in state court in May 2009. AEGON removed the case to federal court, and, in June 2009, Hargrave amended her complaint to include Commonwealth as a defendant. After Commonwealth stipulated that it was the proper defendant, the court dismissed Hargrave's claims against AEGON without prejudice. The district court then denied Commonwealth's motion to dismiss, without citing legal authority, because it believed deciding in Commonwealth's favor would be unfair. Hargrave filed a motion for partial summary judgment seeking to recover the monthly benefits Commonwealth had withheld, which the district court granted without stating reasons.

II.

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Commonwealth argues that the documents attached to Hargrave's motion for summary judgment were improperly considered by the district court because they were not in the administrative record. In *Vega v. National Life Insurance Services*, 188 F.3d 287, 299 (5th Cir. 1999) (en banc), *abrogated in part*

---

[5] AEGON's precise role in the benefits determination has not been established, but it is immaterial to the resolution of the issues presented to us.

[6] The administrative record shows that Kalnas and Ohl had repeatedly communicated about Hargrave's benefits claim since 2005.

*on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), we held that, "when assessing factual questions, the district court is constrained to the evidence before the plan administrator." The administrator must first "identify the evidence in the administrative record," then the claimant may contest whether that record is complete. *Vega*, 199 F.3d at 299.

Once the scope of the administrative record has been determined, the district court may stray from it in only limited circumstances, none of which is applicable here. *See id.* To add evidence into the administrative record, the claimant, before filing suit, may "submit[] it to the administrator in a manner that gives the administrator a fair opportunity to consider it." *Id.* at 300. "If the claimant submits additional information to the administrator . . . and requests the administrator to reconsider his decision, that additional information should be treated as part of the administrative record." *Id.*

Although Commonwealth does not say specifically which documents attached to the motion for summary judgment it believes were improperly considered, it explained to the district court that it was referring solely to the affidavits Hargrave submitted (exhibits A and B) and to exhibits 9 through 15. Those exhibits consist of correspondence between Hargrave and Commonwealth (and Hargrave and AEGON, after Kalnas directed Hargrave to speak to AEGON instead) and affidavits attesting to the authenticity of the exhibits. All correspondence occurred before Hargrave sued and in a manner that gave the administrator a fair opportunity to consider it. That evidence therefore was part of the administrative record, and the court properly considered it. *See id.* Although the affidavits's attestations to the authenticity of the other exhibits were not part of the administrative record, the court could consider them for the limited purpose of showing that the other exhibits were.[7] The district court therefore did not er

---

[7] *See Vega*, 188 F.3d at 300 ("[W]e will not permit the district court or our own panels (continued...)

roneously rely on evidence outside the administrative record to resolve the merits of Hargrave's claim.

## III.

Hargrave sues to "recover benefits due to [her] under the terms of the plan, to enforce [her] rights under the terms of the plan, [and] to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). First, we must determine which version of the Plan applies: the pre-settlement 1991 version or the post-settlement 1998 version. Hargrave argues that Commonwealth's offset of her benefits beginning in 2006, based on the language in the 1998 Plan, because of a settlement she obtained in 1994, is an impermissible retroactive application of the Plan. Under our precedent, it was not. Because the post-amendment benefits she seeks are not "due to" her and she has no "right" to them under the terms of the 1991 Plan, the terms of the 1998 Plan apply.

Where, as here, the plan gives the administrator discretionary authority to determine eligibility for benefits, we apply an abuse-of-discretion standard to the denial of benefits. *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009). If the administrator's determination is legally correct, however, our review ends, and there can be no abuse of discretion. *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 257 (5th Cir. 2009). Only if the determination was legally incorrect must we determine whether the administrator's decision was an abuse of discretion. *Id.* We consider three factors in assessing whether the administrator's determination was legally correct: "(1) whether the administrator has given the plan a uniform construction, (2) whether [it] is consistent with a fair reading of the plan, and (3) any unanticipated costs [to the

---

[7] (...continued)
to consider evidence introduced *to resolve factual disputes with respect to the merits of the claim* when that evidence was not in the administrative record." (emphasis added)).

No. 10-30720

plan] resulting from different interpretations of the plan." *Id.* at 258 (quoting *Crowell v. Shell Oil Co.*, 541 F.3d 295, 312 (5th Cir. 2008)).

With respect to the first factor, Hargrave has not alleged that Commonwealth did not give the Plan a uniform construction, and there is no evidence it did. The second factor, whether the administrator's determination is consistent with a fair reading of the plan, is the most important factor, *id.* at 257, and is the focus of our discussion.[8]

In *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka & Santa Fe Ry.*, 520 U.S. 510, 515 (1997), the Court reaffirmed the principle that "unless an employer contractually cedes its freedom, it is generally free under ERISA, for any reason at any time, to adopt, modify, or terminate [its] welfare plan." (internal quotation marks and citations omitted). "The flexibility an employer enjoys to amend or eliminate its welfare plan is not an accident" but a congressionally-recognized feature of ERISA to reduce the cost and simplify the administration of ERISA plans. *Id.* If plans were locked into the benefits they initially offered, they would "err initially on the side of omission," harming beneficiaries.[9] Thus, "welfare plans offer benefits that do not 'vest' (at least insofar as ERISA is concerned)." *Id.* at 514.

Although ERISA does not statutorily vest welfare plan benefits, an employer may choose to vest future benefits *contractually*. Whether an employer may reduce or deny welfare plan benefits (retroactively or otherwise) turns on wheth-

---

[8] We need not discuss the third factor—whether different interpretations of the Plan would result in unanticipated costs to Commonwealth—because Commonwealth's interpretation is less costly to it than is Hargrave's, and the other two factors already go in Commonwealth's favor.

[9] *Inter-Modal*, 520 U.S. at 515 (quoting *Heath v. Varity Corp.*, 71 F.3d 256, 258 (7th Cir. 1995)); *see also Moore v. Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988) ("Congress evidenced its recognition of the need for flexibility in rejecting the automatic vesting of welfare plans. Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables.").

No. 10-30720

er the benefits have contractually vested.[10] An employer vests an ERISA welfare plan benefit "when it intends to confer unalterable and irrevocable benefits on its employees, and it does so by using clear and express language." *Halliburton Co. Benefits Comm. v. Graves*, 463 F.3d 360, 377 (5th Cir. 2006).

Not only did Commonwealth not use "clear and express language" that it intended to confer unalterable and irrevocable benefits to Hargrave, it used clear and express language that it *did not* intend to do so. The 1991 Plan plainly states, "While the company fully expects to continue this Plan indefinitely, the company reserves the right to change or discontinue this Plan." Thus, Hargrave's right to future benefits never vested.[11] Accordingly, Commonwealth was free to alter the 1991 Plan to modify (or even terminate) Hargrave's future benefits, which is precisely what it did when it amended the Plan in 1998. Once it did so, the terms of the 1998 Plan governed Hargrave's subsequent benefits.[12]

We have already so held in an essentially identical case. In *McGann v.*

---

[10] *See Spacek v. The Maritime Ass'n ILA Pension Plan*, 134 F.3d 283, 293 (5th Cir. 1998) ("[T]o the extent that we have concluded that nothing in ERISA prohibits retroactive application of the Amendment to Spacek in this case, whether the Amendment can be retroactively applied to him will be determined by the terms of the Plan itself. Unless the Plan's language indicates that it has contractually obligated itself not to do what ERISA would otherwise entitle it to do . . . no basis exists for concluding that the Plan's application of the Amendment to Spacek constituted an abuse of discretion.").

[11] *See Halliburton*, 463 F.3d at 378 ("If a contract provides that benefits can be terminated, then those benefits do not vest." (quoting *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995))); *Spacek*, 134 F.3d at 293 ("[A] general amendment provision in a welfare benefits plan is of itself sufficient to unambiguously negate any inference that the employer intends for employee welfare benefits to vest contractually, and thus become unalterable, after the employee retires.").

[12] *See Hackett v. Xerox Corp.*, 315 F.3d 771, 774 (7th Cir. 2003) ("If benefits have not vested, the plan participant does not have an unalterable right to those benefits. . . . Since the employer can change the plan, then it must follow that the controlling plan will be the plan that is in effect at the time a claim for benefits accrues."). A claim for benefits under ERISA accrues "at the time benefits are denied," *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 n.6 (5th Cir. 2004), so the Plan in effect at the time Hargrave's claim for benefits accrued was the 1998 Plan.

*H & H Music Co.*, 946 F.2d 401, 403 (5th Cir. 1991), McGann, the plan partici-
pant, was diagnosed with AIDS, and after he submitted his first insurance claim,
the employer amended the plan to reduce benefits for all employees with AIDS
from up to $1 million to only $5,000. Before the amendment, the employer had
fully reimbursed McGann for his medical expenses, but afterward it limited reim-
bursement to $5,000. *Id.* at 405 n.5. As here, the plan contained a provision
permitting the plan sponsor to terminate or amend the plan at any time. *Id.* at
405. The employer conceded that the reason it reduced benefits was because of
its knowledge of McGann's illness. *Id.* at 404 & n.4.

McGann sued, arguing that he was entitled to the $1 million benefits cap.
*See id.* at 403. We held that the cap was not a vested benefit, because the plan
"show[s] no *promised* benefit, for there is nothing to indicate that defendants ever
promised that the $1,000,000 coverage limit was permanent." *Id.* at 405. Thus,
McGann was not entitled––he had no "right" to—the continued availability of the
limit after the plan was amended.[13]

Similarly to the employer in *McGann*, Commonwealth amended the 1991
Plan in 1998, as the 1991 Plan said it could, and took advantage of that amend-
ment to reduce Hargrave's subsequent benefits payments. It is true that Com-
monwealth denied Hargrave benefits because of events that occurred before the
Plan was amended, but the same was true in *McGann*, where the plaintiff con-
tracted AIDS and received benefits under the earlier version of the plan until his
employer amended the plan to reduce subsequent benefits. *Id.* at 403, 405 n.5.
*McGann* is the same as the instant case if we replace "contracted AIDS" with

---

[13] *McGann*, 946 F.2d at 405. *McGann* discussed the issue in the context of a discrimina-
tion claim under Section 510 of ERISA. *Id.* But § 510's reference to "any right to which [the
participant or beneficiary] is entitled under the provisions of an employee benefit plan," 29
U.S.C. § 1140, refers to the same rights as does § 502(a)(1)(B)'s reference to "rights under the
terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Indeed, § 510 is broader in scope than § 502(a)-
(1)(B), because it also covers "any right to which such participant *may become entitled* under
the plan." 29 U.S.C. § 1140 (emphasis added).

"obtained a tort settlement."

Indeed, the result in *McGann* was far harsher than Commonwealth's change in benefits:  An employee who had recently discovered he had AIDS was left with essentially no disability insurance to pay for it. By contrast, Hargrave, although totally disabled, received several hundred thousand dollars through her settlement, and Commonwealth seeks only to reduce her disability benefits by about $80,000 because of that settlement.  In addition, unlike in *McGann*, Commonwealth did not amend the Plan *because of* Hargrave's settlement, because it did not even know about it at the time.  It merely used that amendment to reduce Hargrave's subsequent benefits.

The decision in *Member Services Life Insurance Co. v. American National Bank & Trust Co. of Sapulpa*, 130 F.3d 950 (10th Cir. 1997), relied on by Hargrave, is also instructive.  In February 1988, a fire severely injured several children who were beneficiaries under their father's welfare benefit plan.  The plan paid out about $570,000 in medical expenses incurred by the children; it did not allow offsetting of tort settlement proceeds at the time but did permit amendments and modifications.  *Id*. at 952.

In October 1988, the plan was amended to allow the administrator to recoup any money received from a negligent third party as a result of injuries for which benefits were paid.  In October 1992, the children's guardian was awarded a $19 million judgment against the third-party tortfeasor, but the judgment was for strict product liability, not negligence.  As a result, in January 1993 the administrator amended the plan again to provide for a right of recoupment against settlement payments received by a beneficiary from a third-party tortfeasor under any theory of liability, with the amendment retroactively effective as of August 1987.  The administrator attempted to use the amendment to claw back the $570,000 in medical expenses it had already paid out.  *Id*. at 952-53.  The Tenth Circuit held that, because the benefits already paid by the plan were "vested

11

No. 10-30720

through payment," retroactive application of the amendment "would impermissibly destroy vested rights." *Id.* at 954.

That is consistent with our holding here. The plan in *Member Services* had paid out benefits under the earlier contract; that money already belonged to the beneficiaries, because performance had already occurred under the contract as it existed at the time of payment.[14] The administrator could not then claw back those past benefits by amending the contract later; that amended contract would apply only to future, still unvested payments.

The facts of this case differ from those in *Member Services*, because Commonwealth has not attempted to take back a penny that it has already given to Hargrave. Commonwealth has merely denied Hargrave future benefits that it never promised her and that have not yet "vested through payment" by an amendment to the Plan. Indeed, that is precisely the ground on which *Member Services* distinguished *McGann*:

> [The plan in *McGann*] never guaranteed the continued availability of the original $1,000,000 limit. While the $1,000,000 limit was in effect, the employee had been fully reimbursed for all claimed expenses incurred. Moreover, after the date of the amendment imposing the $5,000 limit on AIDS-related claims, the employee had been reimbursed for up to $5,000 of all such expenses. Thus, the employer had at all times honored the existing, enforceable obligations it had assumed.

*Id.* at 956 (citing *McGann*, 946 F.2d at 405 & n.5). Hargrave misunderstands *Member Services* by focusing on how Commonwealth's purpose is similar to the plan administrator's in that case rather than on the Tenth Circuit's reasoning,

---

[14] *See Member Servs.*, 130 F.3d at 956 ("The notion of protecting vested rights prevents one party to a contract from unilaterally changing the terms of performance *after that performance has become due*. While it is true that benefits need never vest prospectively under an ERISA welfare benefit plan, [ERISA case law] and general principles of insurance contract law hold that such benefits do vest *when performance is due under the contract*. At that point, the contract is no longer executory and must be performed in accordance with the terms then in existence." (emphasis added)).

No. 10-30720

which distinguishes between clawing back past benefits and reducing or terminating future benefits. Thus, because Commonwealth's decision to apply the 1998 Plan was legally correct, it could not have abused its discretion by relying on the language of the 1998 Plan. *Stone*, 570 F.3d at 257.

## IV.

Given that the 1998 Plan applies, the next question is whether Hargrave is time-barred from bringing her claim pursuant to the limitation-of-actions provision in the 1998 Plan. Hargrave correctly argues that Commonwealth waived that argument by failing to raise it in the district court.

Although Commonwealth never addressed the limitations issue in the district court, its co-defendant, AEGON, which was represented by the same counsel as was Commonwealth, raised that issue at length in its motion to dismiss, to which Hargrave responded. Commonwealth thus argues that AEGON's raising the issue preserved it for Commonwealth's appeal.

We have held that the mere fact that only one party's counsel raises an argument before the district court does not necessarily preclude another party's counsel from making that identical argument on appeal.[15] In some cases, for a defendant to raise the same argument that a codefendant already made would be an empty formality.[16]

---

[15] *See United States v. White*, 589 F.2d 1283, 1290 n.14 (5th Cir. 1979) ("Counsel for Keno did not object to this wording in the instruction; counsel for White did. We believe objection by codefendant's counsel is sufficient to preserve any error." (citing *United States v. Lefkowitz*, 284 F.2d 310, 313 n.1 (2d Cir. 1960)).

[16] *See United States v. Westbrook*, 119 F.3d 1176, 1185 (5th Cir. 1997) ("[L]ittle reason may exist to refuse to permit codefendants to appeal such points because (1) at least one defendant properly raised the issue now on appeal and ensured that the district court would consider it (at least with regard to the defendant who raised it), (2) identical challenges mounted by similarly situated codefendants would not have changed the district court's ruling, and (3) if one defendant succeeded in convincing the district court to grant his motion, his codefendants
(continued...)

13

No. 10-30720

In this case, however, because the district court dismissed the claims against AEGON on other grounds, it did not need to address AEGON's argument that Hargrave brought her claim too late. Had Commonwealth itself pressed that argument, the district court would have had to address it, but because Commonwealth did not raise it, the court never ruled on it. We are thus bereft of the district court's considered views on Commonwealth's limitations defense. So Commonwealth waived its right to assert that defense on appeal.

V.

We must now address whether Commonwealth could offset Hargrave's future benefits in 2006 on the basis of the 1998 Plan language. Hargrave argues that, even if the 1998 Plan applies, she is entitled to recover benefits under that version of the Plan.

A.

Hargrave points to a provision in the 1998 Plan that says, "No amendment to the Long-Term Disability Plan, specifically including a Long-Term Disability Plan amendment with a retroactive effective date, may negate or reduce a benefit to which you are entitled under the Long-Term Disability Plan on account of a claim incurred prior to the Long-Term Disability Plan amendment."[17] She argues that because she was entitled to benefits under the 1991 Plan, the 1998 Plan

---

[16] (...continued)
would then simply have filed the same motion.").

[17] Hargrave also points to another provision of the 1998 Plan that says, "The Company reserves the right . . . at any time and from-time-to-time [sic], and retroactively if deemed necessary or appropriate, to amend any or all of the provisions of the [Plan]. . . ." That provision does not help Hargrave. It merely states that amendments can go into effect retroactively, i.e., the effective date of an amendment can occur before the date of the amendment's enactment. But that is not the sort of "retroactivity" that is at issue. The question is not when the 1998 amendments went into (or could go into) effect—that happened in 1998—but only whether they can be used to reduce benefits in 2006 based on a pre-1998 settlement.

14

amendments may not negate or reduce those benefits under the terms of the 1998 Plan.

The provision Hargrave cites is ambiguous about whether it means that only amendments to *the 1998 Plan* may not negate or reduce benefits to which one is entitled under *the 1998 Plan*, or whether it also means that amendments to *the 1991 Plan* may not negate or reduce benefits to which one is entitled under *the 1991 Plan*. That ambiguity exists because the Plan language refers to benefits to which one is entitled "under the Long-Term Disability Plan" without explaining whether that means the 1998 version only or also previous versions.

We do not need to resolve that ambiguity, however, because the provision does not entitle Hargrave to benefits either way. If the provision means only that amendments to the 1998 Plan may not negate or reduce benefits to which one is entitled, it would not apply, because the 1998 Plan has not, to our knowledge, been amended. If it instead means that amendments to the 1991 Plan may not reduce benefits to which Hargrave is entitled, it would still not help Hargrave, because she was not "entitled" under the 1991 Plan to a certain level of future benefits: The 1991 Plan stated that the employer could change or terminate the Plan.

That latter conclusion follows from the plain meaning of the word "entitled" and our analysis in part II, *supra*. To "entitle" means "[t]o grant a legal right to or qualify for." BLACK'S LAW DICTIONARY (9th ed. 2009). Because benefits under the 1991 Plan could be changed or discontinued, Hargrave had no legal right to and did not qualify for, i.e., was not entitled to, a guaranteed level of benefits under that Plan. Just as we held in *McGann* that the plaintiff was not entitled to his $1 million coverage limit because it was never promised to him, *see McGann*, 946 F.2d at 405, the same is true here. Indeed, the section of ERISA that we interpreted in *McGann* specifically referred to "any right to which the [participant or beneficiary] is *entitled* under the provisions of an employee benefit plan"

and "any right to which such participant *may become entitled* under the plan." *Id.* at 403 (emphases added) (quoting 29 U.S.C. § 1140). To be sure, *McGann* involved interpretation of a statutory provision, not a contractual provision, but it would make no sense for the word "entitled" to mean something different, in an ERISA-governed benefit plan, from what it means under the plain language of ERISA itself, absent a plan provision indicating otherwise.[18]

## B.

That leaves the question whether the 1998 Plan permits the offsetting of tort settlement proceeds against benefits paid under the Plan. As mentioned, the 1998 Plan says,

> The benefits you receive under the [Plan] will be reduced to the extent that you qualify for benefit payments from any of the following: . . . disability payments which result from the act or omission of any person whose action caused your disability. These payments may be from insurance or other sources.

The Plan's reference to the offsetting of Plan benefits to the extent a beneficiary qualifies for "benefit payments," an undefined term in the Plan, suggests that it might permit offsetting only payments that a beneficiary receives from another insurance policy or the like.[19] Indeed, most of the specific types of "benefit payments" cited by the Plan fit that categorization. But that meaning of "benefit payments" is belied by the fact that "income from any employer, or from any occupation or compensation for profit" qualifies as a benefit payment as well. Ordinary employment income is surely not a form of insurance, pension, or annuity

---

[18] Our interpretation of the word "entitled" does not render the Plan provision superfluous. If, for example, a participant's benefits had "vested through payment" under the Plan before an amendment, that participant would be "entitled" to those benefits, and the amendment could not retroactively negate or reduce them. *See Member Servs.*, 130 F.3d at 954.

[19] *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) (defining "benefit" as, *inter alia*, "a payment or service provided for under an annuity, pension plan, or insurance policy").

income.  Moreover, the Plan also uses the terms "[o]ther [i]ncome" and "[o]ther income benefits" to refer to income that may be offset against Plan benefits, also implying a broader meaning of "benefit payments."  The term "benefit payments" under the Plan is thus more fairly construed as broadly meaning other financial assistance, rather than merely financial assistance from insurance or similar sources, which, indeed, is not inconsistent with another dictionary definition of "benefit."[20]

Moreover, the Plan's subsequent reference to "disability payments which result from the act or omission of any person whose action caused your disability . . . from insurance *or other sources*" (emphasis added) fairly covers tort damages for a disability.  That provision broadly refers to sources other than insurance and does not suggest that such sources are limited to those that serve a function similar to insurance.  Rather, coming as it does after a listing of numerous different types of alternative sources of financial assistance for a person with a disability, it appears to be a sort of catch-all provision to cover other disability payments not previously listed.  The provision's application is limited to payments for the disability that "result from the act or omission" of a person who caused the disability, but tort damages (or a settlement of the claim) plainly fit that language.

Further confirming the view that the Plan is meant to permit offsetting of tort settlement payments, it explains, in the section explaining how to offset other income, that

> If you receive lump sum payments  . . . which result from the act or omission of any person who caused your disability, that part of the lump sum payment that is for disability will be counted, even if it is not specifically apportioned or identified as such.  This will be done whether or not it is the result of a compromise, settlement, award, or judgment.

---

[20] *See id.* (also defining "benefit" as "financial help in time of sickness, old age, or unemployment").

No. 10-30720

That language is broad enough comfortably to include a tort settlement or judgment. Commonwealth's reading of the 1998 Plan to permit offsetting of proceeds resulting from a tort settlement with the person who caused the beneficiary's injury is thus a fair reading of the Plan and is legally correct, so we need not ask whether that determination was an abuse of discretion. *Stone*, 570 F.3d at 257.[21]

C.

Finally, Hargrave urges, for the first time on appeal, that her tort settlement payments are not payments for her disability. Because the district court did not address that argument, we remand for it to decide that issue and any others in the first instance. The summary judgment and award of attorney's fees are VACATED and REMANDED for whatever proceedings the district court may deem appropriate. We express no views on what the district court should decide on remand.[22]

---

[21] Accordingly, we do not address Hargrave's arguments that Commonwealth abused its discretion in making its benefits determination.

[22] Judge DeMoss concurs in the result only.