**Judy HUNTER, et al.**

v.

**BERKSHIRE HATHAWAY, INC. and Acme Building Brands, Inc.**

**ACTION NO. 4:14–CV–663–Y**

United States District Court, N.D. Texas, Fort Worth Division.

Signed August 5, 2015

Gary A. Gotto, Christopher Graver, Keller Rohrback L.L.P., Phoenix, AZ, John Jeremiah Shaw, Myers Law, Fort Worth, TX, Mark Clarence Hill, Fort Worth, TX, for Judy Hunter, et al.

Ralph H. Duggins, Cantey Hanger LLP, Fort Worth, TX, Anthony F. Shelley, Brian A. Hill, Miller & Chevalier Chartered, Washington, DC, for Berkshire Hathaway, Inc. and Acme Building Brands, Inc.

## ORDER GRANTING MOTION TO DISMISS

TERRY R. MEANS, UNITED STATES DISTRICT JUDGE

Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Original Com-

plaint (doc. 16). After consideration of the motion, the related briefs, and the applicable law, the Court concludes that the motion should be and hereby is GRANTED.

## I. Factual Background

Plaintiffs' complaint alleges that they are current or retired employees of defendant Acme Building Brands, Inc. ("Acme"). Plaintiff Judy Hunter is Acme's Chief Financial Officer and a member of both the Acme Brick Company 401(k) Retirement and Savings Plan ("the 401(k) plan") Investment/Administrative Committee ("the 401(k) committee") and the Retirement/Administrative Committee ("the pension committee") for the Acme Brick Company Pension Plan ("the pension plan"). Acme is the sponsor and a named fiduciary of both plans, and the committees are the plan administrators. All of the plaintiffs are participants in the plans.

In 2000, Justin Industries, Acme's parent, agreed to be acquired by defendant Berkshire, Hathaway, Inc. ("Berkshire"). As a result, Justin and Berkshire entered into a merger agreement that contains the following provision:

Section 5.7 Employee Matters

(a).... **Parent [Berkshire] shall, and shall cause the Company [Acme] to, honor in accordance with their terms all employee benefit plans** (as defined in Section 3(3) of ERISA) and other employment, consulting, benefit, compensation or severance agreements, arrangements and policies of the Company (collectively, the "Company Plans"); **provided, however, that Parent [Berkshire] or the Company [Acme] may amend, modify or terminate any individual Company Plans in accordance with the terms of such Plans and applicable law** (including obtaining the consent of the other parties to and beneficiaries of such Company Plans to the extent required thereunder); **provided further, that notwithstanding the foregoing proviso, Parent [Berkshire] will not cause the Company [Acme] to** (i) reduce any benefits to employees pursuant to [the Company Plans] for a period of 12 months following the Effective Time, **(ii) reduce any benefit accruals to employees pursuant to any such Plans that are defined benefit plans, or (iii) reduce the employer contribution pursuant to any such Plans that are defined contribution pension plans** ....

(Compl.(doc.1) 4, ¶ 15; Defs.' App. (doc. 17) 31) (emphasis added.) Plaintiffs allege that at the time of this agreement, the pension plan was overfunded by approximately sixty million dollars. As a result, Plaintiffs contend that this provision was "included in the Merger Agreement to secure and protect, both contractually and under ERISA, participants' future benefits under the Retirement Plans in light of new ownership, as well as the significantly overfunded financial position of the Pension Plan." (Compl.(doc.1) 4, ¶ 16.)

Beginning in 2006, however, Berkshire allegedly contacted Acme about the possibility of imposing a "hard freeze" on the pension plan that would eliminate any future accruals of benefits for plan participants and would preclude participation in the pension plan by new employees. Acme advised Berkshire that a hard freeze would violate section 5.7 of the merger agreement and ERISA. Berkshire thereafter dropped the issue until the summer of 2012, when it informed Acme that it "wanted to move forward with reducing retirement benefits." (*Id.* 6, ¶ 23.)

During the 2012 discussions, Acme allegedly discovered that it had mistakenly reduced the 401(k) plan's company matching contribution from fifty percent to twenty-five percent for 2010 and 2011. Acme informed Berkshire that such a reduction was not permitted under section 5.7 of the

merger agreement. Berkshire directed Acme not to make any retroactive corrections and further mandated that Acme not prospectively restore the company match to fifty percent. As a result, Acme's matching contribution remained at twenty-five percent through 2013.

In January 2013, Plaintiffs allege that Acme was forced by Berkshire to "adopt a 'soft freeze' immediately." (*Id.* 8, ¶ 28.) As a result, effective March 1, 2013, new employees were prevented from participating in the pension plan.

In 2014, Berkshire allegedly again contacted Acme about reducing or eliminating benefits in Acme's retirement plans. The committees, as plan administrators, reviewed and analyzed the plans and the merger agreement (both in its current and prior forms), considered other options, and also consulted outside counsel. Ultimately, the committees concluded that section 5.7 of the merger agreement was unambiguous and did not permit Acme to implement a 'hard freeze' or the reductions requested by Berkshire and previously mistakenly implemented in 2010 and 2011 but knowingly continued through 2013.

As a result of Berkshire's repeated requests to reduce these benefits and alleged failure to permit Acme to return the matching contribution to fifty percent, an ethics report was filed with Berkshire's audit committee. Despite repeatedly seeking a resolution from this committee, none was forthcoming. As a result, on June 12, 2014, the 401(k) and pension-plan committees sent a letter to Acme's board of directors demanding that Acme retroactively restore the fifty-percent matching contributions. The letter threatened legal action if Acme did not make the requested payments.

Berkshire allegedly responded by directing Dennis Knautz, Acme's president and chief executive officer, to give the committees an ultimatum: either (1) agree to a "hard freeze" of the pension plan and restore the 401(k) plan's employer matching contribution to fifty percent, with the caveat that it could be changed anytime after 2014; or (2) agree to a "hard freeze" of the pension plan to be effective in five years and leave the 401(k) employer match at twenty-five percent. Knautz allegedly "reported that these alternatives were nonnegotiable, and that if neither of the alternatives were accepted by the Committees, then Berkshire .... intended to divest itself of Acme as a subsidiary." (*Id.* 17, ¶ 55.) As a result, concerned both that section 5.7 precluded them from legally amending the plans in the manner in which Berkshire demanded and that their failure to do so would result in Berkshire's divestiture of Acme, the committees ultimately chose the first option and amended the pension plan accordingly on August 11, 2014.

As a result, Plaintiffs filed this suit. Plaintiffs seek declaratory relief under section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(3) (West 2009), that (1) the terms of the plans were amended by section 5.7 of the merger agreement to include restrictions on changes to the plans as set forth in section 5.7, and (2) that the purported amendment to the plans dated August 11, 2014 violates the retirement plans, as amended by the merger agreement. Plaintiffs also contend that Acme breached its fiduciary duties to both plans under ERISA. *See* 29 U.S.C.A. § 1109(a) (West 2009). Plaintiffs further complain that Berkshire knowingly participated in Acme's breaches of fiduciary duties and also assert an alternative breach-of-contract claim against Berkshire. Plaintiffs seek declaratory and injunctive relief, damages, attorney's fees and costs. Defendants' motion seeks dismissal of all of Plaintiffs' claims.

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted." This rule must, however, be interpreted in conjunction with Rule 8(a), which sets forth the requirements for pleading a claim for relief in federal court. Rule 8(a) calls for "a short and plain statement of the claim showing that the pleader is entitled· to relief." FED. R. CIV. P. 8(a); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, 122 S.Ct: 992, 152 L.Ed.2d 1 (2002) (holding Rule 8(a)'s simplified pleading standard applies to most civil actions). As a result, "[a] motion to dismiss for failure to state a claim is viewed with disfavor. and is rarely granted." *Kaiser Aluminum & Chem.. Sales v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983) (quoting Wright & Miller, *Federal Practice and Procedure* § 1357 (1969)). The Court must accept as true all well-pleaded, nonconclusory allegations in the complaint and liberally construe the complaint in favor of the plaintiff. *Kaiser Aluminum,* 677 F.2d at 1050.

The plaintiff must, however, plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992). Indeed, the plaintiff must ·plead "enough facts to state a claim to relief that is plausible on its face," and his "factual allegations must be enough· to raise a right to relief above the speculative level, ... on the assumption that all the· allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 & 1974, 167 L.Ed.2d 929 (2007). The Court need not credit bare conclusory allegations or "a formulaic recitation· of the elements of a cause of action." *Id.* at 1955, 127 S.Ct.

1955. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable ·inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

In considering a motion to dismiss for failure to state a claim, "courts must limit their inquiry to the facts stated in the complaint and the· documents either attached to or incorporated in the complaint." *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017–18 (5th Cir.1996). Documents attached to or incorporated in the· complaint are considered part of the plaintiff's pleading. *See* FED. R. CIV. P. 10(c); *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir. 2000); *Paulemon v. Tobin,* 30 F.3d 307, 308–09 (2nd Cir.1994); *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990). Documents a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim. *Collins,* 224 F.3d at 498–99.

## III. Analysis

### A. Section 5.7 of the Merger Agreement

Defendants have admitted, for purposes of their motion, that section 5.7 of the merger agreement ·constitutes an amendment to the· retirement plans. (Defs.' Mem. in Supp. of Mot. to· Dismiss (doc. 16–1) 10, n.4.) But Defendants contend that, even so, Plaintiffs cannot point to any "clear and express" contractual language in it that plausibly grants· them the lifetime, unalterable· pension and employer matching benefits they seek. Because all of Plaintiffs' claims are predicated on their interpretation of section 5.7, Defendants contend all claims must be dismissed. Plaintiffs counter that it is unclear that the " 'clear and express' language concept discussed in welfare[-]plan cases is applicable

in retirement plan cases such as this one," (Pls.' Resp. (doc. 25) 4), and that, in any event, that standard is met in this case.

Defendants' contention that Plaintiffs must plausibly allege that the merger agreement clearly and expressly grants them the lifetime pension and employer matching benefits they seek stems from the Fifth Circuit's decision in *Spacek v. Maritime Ass'n*, 134 F.3d 283 (5th Cir. 1998), *abrogated on other grounds by Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004). In *Spacek*, the Fifth Circuit was presented with the question of whether pension-plan fiduciaries could, consistent with ERISA and contract law, apply a plan amendment, which would suspend pension benefits during reemployment following early retirement, to plan participants who retired prior to the plan amendment. *Id.* at 286–87. In determining that the parties' contractual provisions did not preclude application of the amendment to retirees' pension benefits, the court noted that the plan documents contained a "broad amendment provision" that permitted the trustees to "amend the Plan, from time to time, in any manner not in conflict with the terms of the Trust." *Id.* at 286, 293. The court then relied upon "[t]he strong weight of authority" in ERISA welfare-benefit-plan cases

> throughout the circuits indicat[ing] that, in the area of welfare benefits, which are not subject to ERISA's minimum vesting and accrual requirements, ... a general amendment provision in a welfare

benefits plan is of itself sufficient to unambiguously negate any inference that the employer intends for employee welfare benefits to vest contractually, and thus become unalterable, after the employee retires. *See Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1512 n. 2 (10th Cir.1996) ("We recognize that the weight of case authority supports the ... approach, that a reservation of rights clause allows the employer to retroactively change the medical benefits of retired participants, *even in the face of clear language promising company-paid lifetime benefits*." (emphasis added)).

*Id.* at 293. The court "acknowledged that courts have traditionally applied contract law in a manner that affords pension benefits greater protection than welfare benefits" but concluded that

> [b]ecause Congress has chosen to protect pensioners' expectations of retirement security statutorily, the courts need not endeavor—and indeed have no justification for endeavoring—to safeguard pensioners' interests by liberally applying equity-based theories of contract construction that deviate from contract laws' traditional focus on the intent of the parties as determined by the objective manifestations of that intent contained in the language of the parties' agreement.

*Id.* at 294–95. The court concluded that the application of the amendment to the retirees did not violate the parties' contractual obligations,[1] noting that

---

1. The Fifth Circuit also decided that no violation of ERISA's "anti-cutback" provision—29 U.S.C. § 1054(g)—had occurred, but that conclusion was later abrogated by the Supreme Court. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 124 S.Ct. 2230, 159 L.Ed.2d 46 (2004). ERISA's " 'anti-cutback' rule ... prohibits any amendment of a pension plan that would reduce a participant's 'accrued benefit.' " *Id.* at 741, 124 S.Ct.

2230. The Court held that this rule prohibits an "amendment expanding the categories of postretirement employment that trigger suspension of payment of early retirement benefits already accrued." *Id.* The Court concluded that the plan's amendment "eliminat[ed] or reduc[ed] an early retirement benefit that was earned by service before the amendment was passed." *Id.* at 744, 124 S.Ct. 2230.

"[E]xtra–ERISA commitments must be found in the plan documents and must be stated in clear and express language." [*Wise v. El Paso Natural Gas Co.*, 986 F.2d 929, 937 (5th Cir.1993) ]. "Courts may not lightly infer an intent' on the part of a plan to "voluntarily undertak[e] an obligation to provide vested, unalterable benefits." *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir.1994). The presence of the broad amendment provision in the Plan leads us to conclude that the Plan's application of the Amendment to [Plaintiff] comports with the legally correct interpretation of the Plan. This is so because the amendment provision undercuts a conclusion that the Plan contains a clear and express intention to guarantee benefits to participants at a level higher than that statutorily required by ERISA.

*Id.; see also Hargrave v. Commonwealth Gen. Corp.'s Long Term Disability*, 430 Fed.Appx. 256, 261 (5th Cir.2011) ("Not only did Commonwealth not use 'clear and express language' that it intended to confer unalterable and irrevocable benefits to Hargrave, it used clear and express language that it *did not* intend to do so . . . . [by stating that] the company reserves the right to change or discontinue this Plan."); *Halliburton Co. Benefits Comm. v. Graves*, 463 F.3d 360, 377 (5th Cir.2006) ("An employer 'vests' a benefit under ERISA when it intends to confer unalterable and irrevocable benefits on its employees, and it does so by using clear and express language."). Other circuit courts' decisions support Defendants' contention that "clear and express language" is required to confer lifetime, unalterable benefits. *See UAW v. Skinner*, 188 F.3d 130, 139 (3d Cir.1999) ("Because vesting of welfare plan benefits constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language."); *Sprague v. Gen. Motors Corp.*,

133 F.3d 388, 400 (6th Cir.1998) ("the intent to vest 'must be found in the plan documents and must be stated in clear and express language' ") (quoting *Wise*, 986 F.2d at 937).

Recently, in *M & G Polymers USA, LLC. v. Tackett*, —— U.S. ——, 135 S.Ct. 926, 190 L.Ed.2d 809 (2015), the Supreme Court referred to the Sixth Circuit's requirement in *Sprague* that an intent to vest lifetime welfare-plan benefits be stated in clear and express language. In *M & G Polymers*, the Court abrogated the Sixth Circuit's decision in *International Union, United 'Automobile, Aerospace, and Agricultural Implement Workers (UAW) v. Yard–Man, Inc.*, 716 F.2d 1476 (1983), in which the Sixth Circuit had concluded that a clear manifestation of intent was not required regarding the duration of a benefit once clearly conferred. 716 F.2d at 1481 n. 2. The Supreme Court concluded that the Sixth Circuit had improperly placed a "thumb on the scale in favor of vested retiree benefits in all collective-bargaining agreements [that had] no basis in ordinary principles of contract law." *M & G Polymers*, 135 S.Ct. at 935. In reaching its conclusion, the Court noted that the Sixth Circuit's decision in *Yard–Man* was inconsistent with its decision in *Sprague*:

The Court of Appeals also failed even to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises. See 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960) (explaining that contracts that are silent as to their duration will ordinarily be treated not as "operative in perpetuity" but as "operative for a reasonable time" (internal quotation marks omitted)). The court recognized that "traditional rules of contractual interpretation require a clear manifestation of intent before conferring a benefit or obligation," but asserted that "the duration of the benefit once clearly con-

ferred is [not] subject to this stricture:" *Yard–Man, supra,* at 1481 n. 2. In stark contrast to this assertion, however, the court later applied that very stricture to noncollectively bargained contracts offering retiree benefits. See *Sprague v. General Motors Corp.,* 133 F.3d 388, 400 (C.A.6 1998) ("To vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must be found in the plan documents and must be stated in clear and express language" (Internal quotation marks omitted)). The different treatment of these two types of employment contracts only underscores *Yard–Man*'s deviation from ordinary principles of contract law.

*M & G Polymers,* 135 S.Ct. at 936–37.

■ Although the parties' supplemental briefs dispute the extent to which the *M & G Polymers* decision supports their arguments,[2] one thing is clear: this Court must construe the parties' agreement using ordinary principals of contract law. And under such principles, as the *M & G Polymers'* majority noted, the parties' intent to vest lifetime benefits must be unambiguously reflected in their agreement. For "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Id.* at 937. Rather,

such benefits are "operative for a reasonable time." *Id.* at 936.

Unlike the welfare-benefit-plan cases cited by Defendants, the contractual language alleged to confer unalterable pension benefits and employer matching contributions is not in a separate section of the parties' agreement from Berkshire's reservation-of-rights clause. Instead, that language is appended as provisos to the reservation-of-rights clause itself. That is, subparagraphs (ii) and (iii) limit Berkshire's ability to require that Acme amend or discontinue the plans.

But fatal to Plaintiffs' argument is the fact that the parties' agreement is silent regarding the duration of those allegedly vesting provisos. The agreement does not clearly state the parties' intention that the benefits allegedly granted in those two clauses operate in perpetuity. Thus, because the alleged vesting language is ambiguous regarding its duration, it cannot be read to vest a certain level of benefits for life. Instead, these clauses must be interpreted to impose a limitation on Berkshire's ability to require a plan amendment or dissolution only for a reasonable time. Plaintiffs' complaint does not allege that the period from the date of execution of the agreement until the date of adoption of the plan amendments-over fourteen years—was not a reasonable period of time under the circumstances. Consequently, dismissal under Rule 12(b)(6) is appropriate.

**2.** Defendants believe the Supreme Court's decision in *M & G Polymers* is "in lock-step" with the Fifth Circuit's requirement in *Halliburton* and *Spacek* that clear and express language be used to confer lifetime benefits. Plaintiffs dispute that contention and note that in Justice Ginsburg's concurring opinion, in which three other justices joined, Justice Ginsburg concluded that "no rule requires 'clear and express' language in order to show that the parties intended health-care benefits

to vest. "Constraints upon the employer after the expiration date of a collective-bargaining agreement," we have observed, may be derived from the agreement's "explicit terms," but they "may arise as well from.... implied terms of the expired agreement." *M & G Polymers,* 135 S.Ct. at 939 (concurring opinion) (quoting *Litton Fin. Printing Div., Litton Business Sys., Inc. v. NLRB,* 501 U.S. 190, 203, 207, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991)).

## B. Fiduciary Duty

▮ Plaintiffs claim that Acme breached its fiduciary duties to the plans' participants and beneficiaries by failing to make all employer contributions and benefit payments required under the 401(k) plan, as amended by section 5.7 of the merger agreement, and by implementing a hard freeze of the pension plan, in contravention of section 5.7 of the merger agreement. Plaintiffs thus complain that Acme's August 11, 2014 amendment to the plans provided for lesser benefits than those allegedly required by section 5.7 of the merger agreement. Defendants contend that Plaintiffs have failed to state plausible claims for breach of fiduciary duty because Acme acted akin to a settlor of a trust rather than in a fiduciary capacity when it implemented the amendment about which Plaintiffs complain:

> Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries. As we said with respect to the amendment of welfare benefits plans ..., employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust. ... Given ERISA's definition of fiduciary and the applicability of the duties that attend that status, we think that the rules regarding fiduciary capacity—including the settlor-fiduciary distinction—should apply to pension and welfare plans alike.

*Lockheed Corp. v. Spink,* 517 U.S. 882, 890–91, 116 S.Ct. 1783, 135 L.Ed.2d 153 (citations omitted); *see also Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) ("ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated."). The Court agrees that Plaintiffs have failed to state plausible claims for breach of fiduciary duties against Acme. As a result, Plaintiffs' claim that Berkshire knowingly participated in Acme's breach of fiduciary duty also fails.

## C. Alternative Breach of Contract Claim

▮ Plaintiffs alternatively assert a breach-of-contract claim against Berkshire, contending that Berkshire breached the merger agreement by preventing Acme from retroactively restoring the 401(k) matching contribution and by causing Acme to implement the hard freeze to the pension plan. Defendants seek dismissal of this claim on the grounds of preemption, contending that Plaintiffs' alternative claim is foreclosed by the Fifth Circuit's decision in *Christopher v. Mobil Oil Corp.,* 950 F.2d 1209 (5th Cir.1992).

In that case, the court concluded that the plaintiffs' state-law claims, including breach of contract based in part on their employer's amendment of its employee-benefit plan, were preempted under ERISA. The Court noted that "a state law will be pre-empted if it has a connection with or reference to [an ERISA] plan" and that "the fact that a claim sought damages measured by pension benefits sufficed as the requisite connection to an employee benefit plan for preemption purposes." *Id.* at 1218 (quotations omitted). The court concluded that the plaintiffs' claims were preempted by ERISA because they

> focus on Mobil's amendment of an ERISA-governed employee benefit plan and Mobil's disclosure to its employees of the terms of the plan. In addition to calculating their damages by computing lost benefits under the plan, a court adjudicating appellants' claims of fraud-

ulent scheme to reduce the work force would have to examine, at a minimum, the operation of the plan prior to the amendment, the language of the plan amendments, and Mobile's communication to its employees about the terms of the plan amendments. Given the breadth of the [preemption] test, we find that these connections are adequate to warrant preemption.

*Id.*

Here, resolution of Plaintiffs' breach-of-contract claim will require interpretation of section 5.7 of the merger agreement and its effect on the 401(k) and pension plans. And the calculation of damages would also require computing lost benefits under the plan. Indeed, Plaintiffs allege that Berkshire's breach of section 5.7 of the merger agreement "resulted and continues to result in the loss of matching funds, as well as the ongoing loss of returns on required by unfunded 401(k) contributions from the date they should have been made." (PLS.' Compl. (doc. 1) 30, ¶ 109.). Consequently, the Court agrees with Defendants that Plaintiffs' breach-of-contract claim is preempted.

### IV. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss Plaintiffs' Original Complaint (doc. 16) is GRANTED. Plaintiffs' claims are DISMISSED WITH PREJUDICE to their refiling.